Filed 6/2/26  In re C.C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.C. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NICOLE O.,<br><br>Defendant and Appellant. | F090946<br><br>(Super. Ct. Nos. 21CEJ300019-2; 21CEJ300019-3; 21CEJ300019-4)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Douglas T. Sloan, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Nicole O. (mother) is the mother of C.C., C.G. and E.G. (collectively, the children), who are the subjects of this dependency case. Mother challenges the juvenile court's order issued at a Welfare and Institutions Code section 366.26[1] hearing that resulted in her parental rights being terminated. Mother contends the juvenile court erred when it declined to apply the beneficial parent-child relationship exception. Mother also contends the juvenile court failed to make final Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) findings and orders.

We conditionally reverse the orders terminating parental rights and remand for further proceedings to ensure compliance with ICWA and the California Indian Child Welfare Act (§ 224 et seq.) (Cal-ICWA).

### FACTUAL AND PROCEDURAL BACKGROUND

*Initial Removal*

In January 2021, the Fresno County Department of Social Services (the department) filed an original petition alleging C.C., C.G., and their older brother J.L. were described by section 300, subdivision (b)(1). The allegations involved eight-month-old C.G. testing positive for methamphetamine without a reasonable explanation. The petition alleged mother and C.G.'s father, Christopher G. (father), had substance abuse problems that affected their ability to provide regular care for C.C. and C.G.

The whereabouts of J.L's father, P.L. were unknown, and C.C.'s father, Ce.C., was in local custody. Mother and Ce.C. denied having any Indian ancestry when questioned by the department. During a team decision meeting, mother identified her brother, sister, and mother as her support system. The maternal grandmother, three maternal aunts, and a maternal uncle attended the meeting through a videoconferencing platform due to COVID-19 protocols. At the detention hearing, C.C., C.G., and J.L. were

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

ordered detained from mother's custody, and they were placed together in the home of C.C.'s paternal grandmother.

The allegations were found true at the jurisdiction hearing held on March 10, 2021. The juvenile court ordered C.C., C.G., and J.L. removed from the custody of mother, and family reunification services were provided to mother and C.G.'s father. Mother was ordered to participate in parenting classes, substance abuse evaluation and recommended treatment, mental health evaluation and recommended treatment, domestic violence evaluation and recommended treatment, and random drug testing. Reasonable supervised visits were to occur between mother, C.C., C.G., and J.L. A six-month review hearing was set for October 13, 2021. The juvenile court found ICWA was not applicable to C.C. and C.G.

**Family Reunification Period**

In August 2021, E.G. was detained shortly after his birth due to mother's substance abuse during the pregnancy. The department filed a petition alleging mother tested positive for amphetamines while E.G. was in utero. Mother and father informed the department they had no Indian ancestry at the time of E.G.'s removal. The juvenile court sustained the allegations pursuant to section 300, subdivision (b)(1) and family reunification services were ordered for mother at the jurisdiction and disposition hearing held on October 27, 2021. ICWA was found to be not applicable to E.G. Mother identified father as the biological father of E.G., but he had not signed the declaration of parentage.

At a continued six-month review hearing on November 17, 2021, family reunification services were ordered to continue as to C.C., C.G., and J.L. In April 2022, the juvenile court continued family reunification services for mother as to E.G., and a 12-month review hearing was set for October 5, 2022. A combined 12-month and 18-month review hearing was scheduled for July 13, 2022, as to J.L., C.C., and C.G. After several

3.

continuances, a contested review hearing was held on May 17, 2023, for the children and J.L.

The final report prepared for the combined 12-month review for E.G. and 24-month review for J.L., C.C., and C.G., dated February 13, 2023, recommended family reunification services be terminated for mother and father and a section 366.26 hearing be set. The children were placed together, and the care providers were willing to provide a permanent plan of adoption. Mother was participating in an outpatient substance abuse program and she completed her parenting class. She attended 32 sessions of her domestic violence program. The social worker's report noted mother recently became consistent with her visitation.

The juvenile court adopted the department's recommendation at the contested review hearing, and it terminated reunification services for mother and father. A section 366.26 hearing was set for August 30, 2023, for the children. Supervised visitation between mother and children was reduced to twice per month.

### January 2024 Selection and Implementation Hearing

The section 366.26 report, dated August 28, 2023, recommended that the juvenile court order continued foster care with a goal of placement with a fit and willing relative for J.L. and terminate the parental rights of mother and father and a plan of adoption be ordered for the children. The children remained placed together in their same placement, and their longtime care providers were willing to provide a plan of adoption.

Mother's attendance of visits was inconsistent at the beginning of the proceedings, but she improved her consistency once visitation became supervised by a third party. The adoption social worker observed visits between mother and the children. Mother read books, played games, and showed affection to the children during the visits. The department's assessment indicated that the children appeared to have a relationship with mother. However, the relationship did not seem to be a significant parent-child relationship that would cause harm to the children if severed.

4.

The ICWA status section of the report indicated mother claimed possible Apache ancestry on July 24, 2023. The department contacted several maternal and paternal relatives of the children to inquire about possible Indian ancestry. The maternal uncle had been told that his grandfather had Apache ancestry, but he explained that none of their family members were enrolled members. No other family members were able to provide any further information to support mother's claim of Apache ancestry.

On September 7, 2023, a Notice of Child Custody Proceeding for Indian Child (form ICWA-030) was sent to the federally recognized Apache and Cherokee tribes. On October 2, 2023, mother filed a section 388 petition requesting either family maintenance or family reunification services. The department filed the final responses to its notice on December 1, 2023. None of the responses from tribes indicated the children were either members or eligible for membership in their tribe.

The juvenile court held a contested hearing on mother's section 388 petition and the section 366.26 hearing on January 19, 2024. The section 388 petition was denied. The juvenile court found termination of parental rights would be detrimental because there would be substantial interference with a sibling relationship and the children would benefit from continuing their relationship with the parents.

A plan of legal guardianship was ordered for the children. Visits between mother and the children were ordered to occur at a minimum of twice per month. The juvenile court ordered continued dependency jurisdiction, and a postpermanent plan review hearing was set for July 10, 2024. There were no explicit findings related to ICWA in the written orders for the section 366.26 hearing.

*Postpermanency Proceedings*

The status review report, dated June 28, 2024, recommended legal guardianship with dependency remaining as the most appropriate permanent plan for the children. The children remained stable in their guardianship placement. Mother and C.C.'s paternal grandmother each denied having any additional information related to mother's claim of

5.

possible Indian ancestry on May 31, 2024.  The department recommended that ICWA continue to be inapplicable to the children.

During supervised visits, mother was observed interacting and redirecting the children when necessary.  There were no behavioral concerns from the children after visits.  The guardian was unwilling to increase visitation to unsupervised at the time of the report.  At the postpermanent plan review hearing, the juvenile court found legal guardianship with dependency continued to be the appropriate plan, and another review hearing was set for December 18, 2024.  The orders for the review hearing contained no explicit findings related to ICWA, but all prior orders not modified were to remain in full force and effect.

The department's report for the postpermanent plan review hearing recommended legal guardianship remain as the children's permanent plan.  The setting of a section 366.26 hearing to assess a plan of adoption was recommended for C.C.  At 12 years of age, C.C. made numerous requests for the children to be adopted by their guardians.

In an addendum report, the department requested that a section 366.26 hearing be set to assess for a plan of adoption on behalf of C.G. and E.G. as well.  The department's assessment determined that a plan of adoption would be more appropriate for each of the children, and the guardians were willing to provide a plan of adoption for the children.  C.G.'s clinician informed the social worker that a plan of adoption with the guardians would be beneficial for C.G.

At a continued review hearing held on January 22, 2025, mother was present and represented by counsel.  A section 366.26 hearing was set for May 21, 2025, for the children.

***August 2025 Selection and Implementation Hearing***

The section 366.26 report, dated May 13, 2025, recommended that the juvenile court terminate the parental rights of mother and father and a plan of adoption be ordered for the children.  The children remained placed together in the home of C.C.'s

6.

grandparents.  C.C. and C.G. had been placed in the home since their removal in January 2021, and E.G. was placed with the guardians shortly after his birth.  The guardians felt the children were already their own children because they had cared for them since the children were infants.

All three children were observed to be in good physical health, and they were developing in an age-appropriate manner.  Twelve-year-old C.C. was considered "specifically adoptable" due to the guardians' desire to provide him with a permanent plan of adoption.  C.G. and E.G. were described as generally adoptable due to their young ages of four years old (C.G.) and three years old (E.G.).

The department's case notes indicated mother was not consistent with her supervised visits with the children.  During supervised visits, mother would bring food and play games with the children.  At the end of visits, mother told the children that she loved them and hugged them.

The adoption social worker observed two of three scheduled visits between mother and the children in April 2025 and May 2025.  Mother did not attend one of the scheduled visits.  The family engaged in conversation and a variety of activities during the visits.  The children left the visits without any distress, and the guardians reported the children did not ask for mother or ask to visit her.  C.C. shared that he enjoyed visiting with mother occasionally.

The adoption social worker's assessment concluded that the children had been out of the parents' care for the majority of their lives, and their guardians had a significant amount of time to build a parent-child relationship with the children.  The guardians expressed their commitment to adoption during each home visit with the social worker.  C.C. desired to be adopted because he felt safe and well cared for in the guardians' home.  The department believed the children deserved to have stability and continuity in their life through a plan of adoption.

The ICWA status section of the report detailed the previous inquiries completed by the department, and additional attempts were made to follow up with maternal and paternal family members in April 2025.  The available relatives were unable to provide any additional information relating to possible Indian ancestry for the children.

On May 19, 2025, father filed a section 388 petition requesting "to put services on hold and an opportunity to reunif[y] with [the] children."  The petition alleged father "completed most of [his] services and tested negative" after a prior incarceration.  The juvenile court set the section 388 petition for a hearing on the same date as the upcoming section 366.26 hearing.  Both hearings were continued to allow for further assessment by parents' counsel.

The department filed an addendum report, dated June 12, 2025, which recommended that father's section 388 petition be denied.  The social worker's report also included an assessment of the children's relationship with J.L. due to the court's previous determination that C.C.'s relationship with mother and J.L. prevented him from being adopted.  Although C.C. was conflicted about his desire for a permanent plan of adoption during the previous section 366.26 hearing, he had consistently expressed a desire to be adopted for the past year.  On June 4, 2025, the adoption social worker asked C.G. and E.G. if they wanted to grow up with the guardians; each responded, "[Y]es," and E.G. identified the guardian as his "mom."

On June 16, 2025, mother filed a section 388 petition requesting the children be placed in her care under a plan of family maintenance.  A hearing was set on mother's request for July 16, 2025.

In a separate addendum report, dated July 15, 2025, the department recommended that mother's section 388 petition be denied.  It was determined that mother's circumstances had not changed significantly enough to provide her with family maintenance services.  The assessment determined that mother's request did not serve the children's need for permanency.

On August 20, 2025, mother was present for the contested hearing on the parents' section 388 petitions and section 366.26 hearing. The contested hearing began with testimony from the adoption social worker, Monica R., and she testified over the course of several dates. Monica testified regarding her experience as a social work practitioner. She served as the adoption social worker during the previous section 366.26 hearing, and she was reassigned to the case in February 2025. The sibling relationship between C.C. and J.L. was described by Monica as "[a] mere friendship."

Mother testified regarding her relationship with the children. She was the primary caretaker of the children before their removal, and she described her relationship with the children as "real close." Mother was visiting with the children twice per month in the time leading up to the contested hearing. She claimed the guardian would cancel visits often. The children appeared happy to see mother, and the family did arts and crafts together.

Mother also provided testimony in support of her request for family maintenance services. She was participating in an outpatient substance abuse program and a 12-step program. Mother believed any permanent plan other than adoption would be in the children's best interest.

On December 3, 2025, the contested hearing continued with testimony from father. He was visiting in-person with C.G. and E.G. twice per month for one hour since his release from prison on September 20, 2025. Father testified that his bond and relationship with C.G. and E.G. kept getting stronger. During the visits, father, C.G. and E.G. ate and played together. Father was still getting to know C.G. and E.G. because they had been away from him, but he felt C.G. and E.G. trusted him.

Father indicated he was in support of mother's request for family maintenance services, and he was willing to do any services offered by the department. He believed his request would be in C.G. and E.G.'s best interest because it would allow them to grow up with their mother and father. Father was not in agreement with the plan of adoption

9.

for C.G. and E.G. because the guardians would not allow him to be a father to them. His testimony concluded with an acknowledgment of previous "bad choices," but he felt that he came a long way as a father.

In closing argument, counsel for the department and children requested the parents' petitions be denied and termination of parental rights for the children. Counsel for mother argued that either her section 388 petition should be granted or the beneficial parent-child relationship exception to adoption was applicable. Father's primary request was to not terminate parental rights for the children. Father's counsel expressed support for mother's request for family maintenance services, and he requested enhancement services be provided in the event that mother's petition was granted.

After hearing argument from all counsel, the juvenile court proceeded to its ruling on the section 388 petitions. The juvenile court reviewed the children's case history, and it noted that four years and 10 months had passed since C.C. and C.G.'s initial placement into foster care. In relation to the children's best interest, the juvenile court determined that any changes by the parents were not for a long enough period given the children's young ages.

As to the beneficial parent-child relationship exception to adoption, the juvenile court discussed the children's recognition of mother and the length of time spent outside of her care. Mother was nurturing and highly appropriate during her visits with the children. However, the children were described as "thriving and developing" in the care of their guardians. The court ultimately concluded there was not an adequate parental bond that outweighs the benefit of adoption. The court also determined the sibling relationship exception had not been proven.

Father's and mother's section 388 petitions were denied. The juvenile court found the children were likely to be adopted, and it terminated the parental rights of mother and the children's fathers and selected a permanent plan of adoption for the children. The

court made no additional findings regarding the potential application of ICWA as to the children at the hearing. Mother filed a timely notice of appeal.

## DISCUSSION

### I. Beneficial Parent-child Relationship Exception

Mother contends the juvenile court erred when it did not apply the beneficial parent-child relationship exception to adoption.

#### A. Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid*.)

11.

The second element of the exception asks whether the child would benefit from continuing the relationship.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid.*)  An adoptive home might provide a new source of stability that alleviates emotional instability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid.*)  Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

In *Caden C.*, the court held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 625–626.)  Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception:  the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.)  A parent's struggles

12.

with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it." (*Id*. at p. 638.)

## B.    Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)  The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id*. at pp. 639–640.)  The juvenile court's decision as to the third element—whether termination of parental rights would be detrimental to the child—is reviewed for an abuse of discretion. (*Id*. at p. 640.)  "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The standard of review of a court's determination that a parent did not meet his or her burden to prove an exception to termination of parental rights is "whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  Specifically, the question is "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.*, at p. 1528.)

## C.    Analysis

In the present case, the juvenile court determined that mother did not meet her burden of proof as to the application of the beneficial parent-child relationship exception. The department concedes that substantial evidence exists in the record to support a finding that mother visited regularly.  However, the juvenile court did not find there was

sufficient evidence that maintaining the children's relationship with mother outweighed the benefits of adoption to establish the exception.

In support of her contention that the juvenile court erred in failing to apply the exception, mother cites to evidence that she had positive and affectionate interactions with the children during visits. While mother consistently visited the children, satisfying the first prong of the exception, she failed to identify any evidence that would compel a finding that termination of her parental rights would cause the children great harm. The evidence before the court established that the children appeared to enjoy the supervised visits that occurred with mother for the four years following their removal. However, evidence that the children had pleasant visits with their mother is not enough to preserve parental rights. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant."].)

Finally, mother also cites to the case of *In re M.V.* (2023) 87 Cal.App.5th 1155, in support of her contention that the juvenile court erred by considering whether mother provided parental caretaking to the children. In *M.V.*, the juvenile court acknowledged that the child wanted to remain in contact with her parents and live with both her parents and her relative care providers, and that she would be sad if she could not see her parents again. (*Id*. at p. 1184.) The court then moved on to the third, detriment element, before it "caught itself" and stated that there was clearly a bond with the child and parents. (*Id*. at pp. 1184–1185.) There was no further discussion about the beneficial relationship element of the analysis, which caused the appellate court to describe the analysis as "cursory" (*id*. at p. 1184), and state, "The court does not appear to have evaluated the quality of the parent-child relationships or to have considered factors such as M.V.'s age, how much of her life she spent in her parents' custody, the positive or negative effects of interaction with the parents, and M.V.'s particular needs. [Citation.] This was error." (*Id*. at p. 1185.)

We do not find that the juvenile court abused its discretion by relying on impermissible factors in ruling on the exception. The juvenile court considered the amount of time the children spent in mother's custody, and there is no indication that it relied on mother's present inability to provide care to bar the parent-child relationship exception, both factors *Caden C.* ruled irrelevant in determining the applicability of the parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 634 [courts should not look to whether the parent can provide a home for the child]; *id*. at p. 637 [a parent's "continued struggles" with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception].)

In sum, the evidence in the record weighed in favor of the preferred permanency option of adoption. Given the fact that the children were still young and spent the majority of their young lives in the care of their prospective adoptive parents, we find the juvenile court did not abuse its discretion. Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating mother's parental rights were proper.

## II.    ICWA Inquiry

Mother also contends the juvenile court's finding that ICWA did not apply was not supported by sufficient evidence because the record for the termination hearing did not include explicit ICWA findings.

### A.    Applicable Law

Under ICWA's state analogue, Cal-ICWA (§ 224 et seq.), the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court, rule 5.481(a).) The agency's initial duty of inquiry includes "asking the child, parents,

legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child ...."  (§ 224.2, subd. (b)(2).)

When initial inquiry gives rise to a "reason to believe" (but not sufficient evidence to determine there is a "reason to know") that an Indian child is involved in a proceeding, "further inquiry regarding the possible Indian status of the child" is required, which includes gathering additional biographical information from family members and contacting relevant tribes.  (§ 224.2, subd. (e)(2)(A), (C).)  "Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case."  (§ 224.2, subd. (e)(2)(C).)

The agency "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes."  (Cal. Rules of Court, rule 5.481(a)(5).)  Before finding ICWA inapplicable, the juvenile court must make a finding that the department conducted "proper and adequate further inquiry" and exercised "due diligence" in doing so, and that "there is no reason to know whether the child is an Indian child."  (§ 224.2, subd. (i)(2).)

B.      Standard of Review

We review the juvenile court's finding that there is no reason to know whether a child is an Indian child under a substantial evidence standard, and the court's finding that the department has conducted a proper and adequate inquiry and due diligence for abuse of discretion.  (*In re K.H.* (2022) 84 Cal.App.5th 566, 600–601; *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004–1005.)

Regarding the juvenile court's discretion in evaluating the department's inquiry efforts, this court explained in *K.H.*, "so long as the [department] conducts a reasonable

16.

inquiry and documents its results, the juvenile court will have the room to exercise its discretion in determining whether the [department's] efforts are sufficient to satisfy the mandates of ICWA and related California law." (*In re K.H.*, *supra*, 84 Cal.App.5th at p. 604.) "The [department's] inquiry must extend far enough to reasonably ensure that if there is information the child is or may be an Indian child, that information is gathered." (*Ibid.*)

An inadequate inquiry requires conditional reversal of the juvenile court's order terminating parental rights with directions to the child welfare department to conduct an adequate inquiry, supported by record documentation. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1136.)

### C. Analysis

Mother contends the juvenile court did not make oral or written ICWA findings at the conclusion of the contested section 366.26 hearing on December 3, 2025. The department asserts that the orders should be affirmed because the juvenile court's ICWA finding could be implied from its reading of the department's report and maintaining prior orders.

The juvenile court is required to make findings as to the applicability of the ICWA, in part because it must "make certain findings affecting an Indian child before ordering foster care or terminating parental rights." (*In re M.B.* (2010) 182 Cal.App.4th 1496, 1502; see *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 704–705, 709.) Where "the dependency case is still ongoing, any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings." (*J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 461.) However, compliance with ICWA is required before terminating parental rights. (*In re K.M.* (2015) 242 Cal.App.4th 450, 458.)

In the present case, mother initially denied having any Indian ancestry at the time of the children's detention. The juvenile court found ICWA was not applicable at the

children's disposition hearings based upon mother's initial denial. However, mother claimed Apache ancestry in advance of the children's first section 366.26 hearing in July 2023. The department sent formal notice to the Apache and Cherokee tribes, and none of the tribes indicated the children were members or eligible for membership in their tribe based on the information provided. The record contains no additional findings related to the juvenile court's ongoing inquiry into the children's possible Indian ancestry after mother's reporting in July 2023. Accordingly, there is no record that the juvenile court made a determination on the adequacy of the department's efforts to inquire into the children's possible Apache ancestry.

Contrary to the department's suggestion, an implied ICWA finding cannot be found here. While findings may be express or implied, we will recognize an implied ICWA finding only when we "can be confident that the juvenile court considered the issue and there is no question but that an explicit ruling would conform to the implicit one." (*In re E.W.* (2009) 170 Cal.App.4th 396, 405.) The California Supreme Court has implied an ICWA finding where, "without such a finding, [the court's] obligation would have been to order further inquiry to ensure that the appropriate tribe had notice and was given the opportunity to intervene before the court terminated parental rights and approved the adoption plan." *(In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101; see *In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1137, 1141 [reviewing implied finding].)

The department's latest report included descriptions of the department's recent efforts at ICWA inquiry, which the juvenile court read and considered. However, this does not establish that the juvenile court meaningfully considered the adequacy of the department's efforts to investigate the children's potential Indian ancestry since mother's belated reporting. In sum, we cannot conclude the juvenile court considered and decided that the department fulfilled its inquiry and notice obligations and the ICWA does not apply. Accordingly, we remand the matter for the juvenile court to enter an ICWA finding based on the department's demonstration of inquiry and notice.

**DISPOSITION**

The orders terminating parental rights are conditionally reversed.  The matter is remanded to the juvenile court for compliance with ICWA and Cal-ICWA as described in this opinion.  If the court thereafter finds a proper and adequate further inquiry and due diligence has been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the orders terminating parental rights.  If the court concludes ICWA applies, then it shall proceed in conformity with ICWA and Cal-ICWA.  (See 25 U.S.C. § 1912(a); §§ 224.2, subd. (i)(1), 224.3, 224.4.)

DETJEN, J.

WE CONCUR:


HILL, P. J.


PEÑA, J.